**IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF DELAWARE**

| | |
|---|---|
| PATRICK E. BYRNE, THE PATRICK E. BYRNE REVOCABLE TRUST U/T/A DATED FEBRUARY 23, 2001, and THE PATRICK E. BYRNE IRREVOCABLE TRUST U/T/A DATED JULY 22, 2021,<br><br>    Plaintiffs,<br><br>  v.<br><br>AMERIS BANK,<br><br>    Defendant. | Case No. _____ |

## COMPLAINT

Plaintiff Patrick Byrne ("Byrne"), The Patrick E. Byrne Revocable Trust U/T/A Dated February 23, 2001 ("Byrne Revocable Trust"), and The Patrick E. Byrne Irrevocable Trust U/T/A Dated July 22, 2021 ("Byrne Irrevocable Trust") (collectively, "Sellers") submit this Verified Complaint, and in support thereof, allege, upon knowledge as to themselves and their own actions and upon information and belief as to all other matters, as follows:

## NATURE OF THE ACTION

1. Byrne is the founder, former majority shareholder, and former Chief Executive Officer of Balboa Capital Corporation ("Balboa"), a financial technology company that provides business lending solutions to small and medium-sized businesses nationwide for the purchase or lease of business equipment.

2. On December 10, 2021, Sellers and Balboa entered into a Stock Purchase Agreement ("SPA") with Defendant Ameris Bank ("Ameris") under which Ameris acquired Balboa. Following the closing of this SPA, Balboa continued to operate in California as a division

of Ameris, with the now-former Balboa employees continuing to perform essentially the same job duties they had previously.

3.      Ameris, however, procured the SPA by fraud.  Critical to the Sellers' inducement to sell Balboa to Ameris was the execution of the Balboa Capital Long-Term Cash Incentive Plan ("LTIP"), which would provide cash bonus awards to employees of the continuing Balboa division of Ameris based on the achievement of certain performance thresholds that were to be calculated based on an agreed-upon formula that was laid out in the LTIP.  Ameris never intended the honor the LTIP, and immediately breached its promise to Sellers and Balboa's former employees by intentionally miscalculating the cash bonus awards due thereunder in violation of the agreed upon calculation formula in the LTIP.  Had Sellers known that Ameris never intended to honor the LTIP, Sellers would not have agreed to enter into the Stock Purchase Agreement with Ameris.

4.      Ameris profited handsomely from its fraudulent acts.  Not only did Ameris' fraud enable it to acquire Balboa by inducing Sellers to enter into the SPA, following the closing of the SPA, the former Balboa employees who were parties to the LTIP were induced by the promise of the cash bonus awards under the LTIP to work above and beyond their normal job responsibilities to ensure that the performance thresholds necessary to trigger the cash bonus awards were met. As a result of Ameris' fraudulent inducement, the hard work of the former Balboa employees increased the Balboa division's profitability substantially, resulting in additional profits for Ameris and increased stock value for Ameris stockholders.

5.      Ameris' fraudulent promise that it would comply with the terms of the LTIP was also critical to Sellers' agreement to certain indemnification rights in the SPA.  More specifically, in reliance on Ameris' fraudulent representation, Sellers agreed to indemnify and hold harmless

2

Ameris against losses incurred in certain litigation that was pending against Balboa at the time of its acquisition.

6. Sellers now bring this action for rescission or partial rescission of the SPA. Ameris should be required to restore to Sellers the benefits procured from Sellers under the SPA, or in the alternative, pay any monetary damages arising from its fraudulent inducement.

7. In the alternative, Sellers seek equitable reformation of the SPA, on the basis of fraudulent inducement, to void the indemnification provisions therein.

## PARTIES

8. Plaintiff Byrne is an individual residing in Orange County, California.

9. Plaintiff Byrne Revocable Trust is a revocable trust that was formed in and under the laws of the State of California.

10. Plaintiff Byrne Irrevocable Trust is an irrevocable trust that was formed in and under the laws of the State of California.

11. Defendant Ameris is a corporation organized under the laws of the state of Georgia with its principal place of business in Atlanta, Georgia.

## JURISDICTION AND VENUE

12. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) because this action involves an amount in controversy that exceeds the sum or value of $75,000, exclusive of interests and costs, and is between citizens of different states.

13. This Court has personal jurisdiction over Ameris because, pursuant to Section 10.8 of the SPA, it consented to this Court's jurisdiction for the purposes of any action arising out of the SPA.

14. Venue is proper in this Court because, pursuant to Section 10.8 of the SPA, Ameris

irrevocably and unconditionally waived any objection to the laying of venue of any action arising out of the SPA in this Court.

## FACTUAL BACKGROUND

15.     Founded in 1988 by Byrne, Balboa is a financial technology company that provides business lending solutions to small and medium-sized businesses nationwide for the purchase or lease of business equipment.  Through Byrne's leadership, Balboa grew into one of the nation's largest privately held finance companies.  Byrne, in conjunction with the Byrne Revocable Trust and Byrne Irrevocable Trust, owned all shares of Balboa prior to its acquisition by Ameris.

16.     Ameris became interested in acquiring Balboa and began negotiations with Byrne. A critical consideration for Byrne throughout the negotiation process was to ensure that Balboa's employees would not lose their jobs following Ameris' acquisition of the company, and that the soon-to-be former employees of Balboa would be fairly compensated for the time, effort, and energy they put into Balboa's continued success as they transitioned into being employees of Ameris.

17.     To that end, Byrne secured Ameris' agreement to enter into the LTIP with eligible former employees of Balboa that would continue on as employees of Ameris following the closing of the acquisition.  Under the LTIP, eligible employees of the Balboa division of Ameris would be entitled to "Cash Bonus Awards" based on the achievement of certain "Performance Goals" defined therein.  The Performance Goals under the LTIP would be satisfied if Balboa reached a minimum threshold of earnings before taxes (or "EBT") of $37 million, $48.5 million, and $57.2 million for the years 2022, 2023, and 2024, respectively.   If Balboa exceeded the Performance Goals for these given years, 35% of the amount by which Balboa exceeded the Performance Goal threshold would be placed in an "Incentive Pool" from which the Cash Bonus Awards would be

4

distributed to employees working in the Balboa division of Ameris.

18.    Critically, to avoid any inconsistencies in the payment of Cash Bonus Awards to former Balboa employees, Byrne ensured that the LTIP contained a specific formula for calculating when the Performance Goals were reached and exceeded that was consistent with Balboa's financial accounting methodologies—the Pioneer 1Q21 Operating Model.  To that end, the LTIP expressly provides that EBT—the critical component of determining whether a Performance Goal was met—"is defined as actual annual earnings before tax as identified as 'Actual Earnings Before Tax' in the Pioneer 1Q21 Operating Model," which was attached the LTIP as Exhibit A.  The LTIP further provides that "[f]or purposes of the calculation of EBT under this Agreement and the Plan (defined below), the Key Assumptions (defined below) must be used in interpretation and application of the Pioneer 1Q21 Operating Model for purposes of the calculation of EBT, and no costs of a type not contemplated by the Pioneer 1Q21 Operating Model will be allocated to Balboa."

19.    Obtaining Ameris' agreement to the terms of the LTIP and commitment to enter into the LTIP with eligible employees of the Balboa division of Ameris was a critical consideration in Byrne's ultimate decision to sell Balboa to Ameris.  Without the LTIP and assurances that the soon-to-be former Balboa employees were protected and would be fairly compensated going forward, Byrne would not have sold Balboa to Ameris.

20.    The LTIP was also a critical consideration in Byrne's decision to agree to certain indemnification provisions in the SPA.  During the negotiation process, Ameris insisted that Sellers indemnify Ameris for any losses associated with two litigations that were pending against Balboa at the time.  Byrne was willing to take on the risk that Sellers would have to indemnify Ameris only because he understood that the soon-to-be-former Balboa employees would be

sufficiently protected and compensated post-acquisition.  Accordingly, Sellers agreed to the indemnification provisions found in Section 8 of the SPA.

21.    On December 10, 2021, Ameris entered into the SPA with Sellers and agreed to the LTIP.

22.    Ameris, however, never intended to perform under the LTIP.  Prior to (and after) its acquisition of Balboa, Ameris utilized financial accounting methodologies that differed materially from Balboa's financial accounting methodologies and the Pioneer 1Q21 Operating Model.  Ameris never intended to apply Balboa's financial accounting methodologies to the newly formed Balboa division despite agreeing to do so in the LTIP.  Instead, Ameris' plan was always to apply its own, materially different, financial accounting methodology to the newly formed Balboa division.

23.    Given that Ameris never intended to perform under the LTIP, unsurprisingly, Ameris immediately breached it.  Beginning with the first LTIP cycle for the year 2022, Ameris intentionally miscalculated Balboa's EBT in violation of the agreed upon calculation methodology under the LTIP.  More specifically, Ameris willfully used methods that were inconsistent with the Pioneer 1Q21 Operating Model and disregarded the "Key Assumptions" that the LTIP required to be applied.  Instead, Ameris calculated the EBT of Balboa using methods that intentionally lowered Balboa's EBT, and by extension, lowered or eliminated the Cash Bonus Awards earned but not received by approximately 145 Balboa employees participating in the LTIP from 2022 to 2024.  Ameris' intentional miscalculations resulted in a reduction of the Incentive Pool for 2022 and eliminated the Incentive Pool for 2023, thereby depriving approximately 145 employees of the Cash Bonus Awards they rightful earned under the LTIP for their work in 2022 and 2023.

24.    Given Ameris' immediate breach of the LTIP, it is clear that Ameris never intended

to honor its terms.  Instead, Ameris fraudulently represented (both by executing the LTIP and during the negotiation process with Byrne) that it would comply with the terms of the LTIP.

25.    Ameris' fraudulent conduct did not end there.  Beginning in about June 2023, Byrne (who remained as CEO of Balboa post-acquisition) complained repeatedly to Ameris that it was miscalculating and changing various inputs to the EBT calculation in violation of the LTIP.  But Ameris did not address Byrne's concerns regarding its clear breach of the LTIP.  Instead, Ameris terminated Byrne in June 2024 to further conceal the fact that it never intended to honor the LTIP in the first place.

26.    As a result of these fraudulent acts, Ameris received a windfall.  Not only did Ameris fraudulently induce Sellers to enter into the SPA, it turned tens of millions of dollars of additional profit for Ameris as a result of the efforts of the former Balboa employees who were motivated by the promise of Cash Bonus Awards under the LTIP to go above and beyond their duties to increase Balboa's profitability, all while being completely unaware that Balboa never intended to honor the terms of the LTIP.

27.    The harms suffered by Sellers cannot be remedied by monetary damages alone. Sellers would not have entered into the SPA, and would not have agreed to indemnify Ameris, had it known that Ameris never intended to comply with the LTIP.  Accordingly, rescission (or partial rescission) of the SPA is warranted.

28.    Alternatively, Sellers seek equitable reformation of the SAFE to void the indemnification provisions in Section 8 of the SPA.

29.    In addition, Ameris has sued Sellers in Delaware Superior Court under the indemnification provisions in the SPA that Ameris fraudulently obtained by misleading Sellers into believing it would honor the terms of the LTIP.  The action initiated by Sellers is captioned

*Ameris Bank v. Patrick E. Byrne et al.*, C.A. No. N25C-05-071 KMM CCLD (Del. Super.) (the "Superior Court Action").

30.     By initiating the Superior Court Action, Ameris breached Section 10.8 of the SPA, which designates the "United States District Court for the District of Delaware and the Court of Chancery" as the "exclusive" venue "for the purposes of any Action arising out of [the SPA]."

## <u>COUNT I</u>

### (Fraudulent Inducement)

31.     Sellers incorporate the foregoing allegations as if fully set forth herein.

32.     During the parties' negotiation of the SPA, Ameris fraudulently, or with reckless indifference to the truth, misrepresented and/or omitted material facts concerning its intention to comply with the LTIP.

33.     During the parties' negotiation of the SPA, Ameris represented, by executing the LTIP and in conversations with Byrne regarding the same, that it would honor and comply with the LTIP's terms.

34.     These representations were false.  Ameris never intended to comply with the terms of the LTIP, and indeed, at its first opportunity to do so, intentionally miscalculated EBT in breach of the agreed-upon calculation methodology provided for in the LTIP.

35.     Sellers would not have entered into the SPA had it known these representations were false.

36.     Sellers would not have agreed to Section 8 of the SPA had they known these representations were false.

37.     Ameris made these representations with the intention of inducing Sellers' reliance.

38.     Sellers reasonably and justifiably relied on Ameris' misrepresentations.

39.     Sellers have suffered harm due to Ameris' fraudulent inducement of Sellers' entry into the SPA in reliance on Ameris' material misrepresentations and/or omission.

40.     Sellers seek a remedy for Ameris' fraudulent inducement in the form of rescission or partial rescission of the SPA.

41.     In addition or in the alternative, Sellers seek a remedy for Ameris' fraudulent inducement in the form of rescissory damages in an amount to be determined at trial.

## COUNT II

### (Reformation – Equitable Fraud (In the Alternative))

42.     Sellers repeat and reallege the foregoing paragraphs and incorporate them as if fully set forth herein.

43.     During the parties' negotiation of the SPA, Ameris fraudulently, or with reckless indifference to the truth, misrepresented and/or omitted material facts concerning its intention to comply with the LTIP.

44.     During the parties' negotiation of the SPA, Ameris represented, by executing the LTIP and in conversations with Byrne regarding the same, that it would honor and comply with the LTIP's terms.

45.     These representations were false.  Ameris never intended to comply with the terms of the LTIP, and indeed, at its first opportunity to do so, intentionally miscalculated EBT in breach of the agreed-upon calculation methodology provided for in the LTIP.

46.     Sellers would not have entered into the SPA had they known these representations were false.

47.     Sellers would not have agreed to Section 8 of the SPA had they known these representations were false.

48.     Ameris made these misrepresentations with the intention of inducing Sellers' reliance.

49.     Sellers reasonably and justifiably relied on Ameris' misrepresentations.

50.     Sellers have suffered harm due to Ameris' fraudulent inducement of Sellers' entry into the SPA in reliance on Ameris' material misrepresentations and/or omission.

51.     Sellers lack an adequate remedy at law.

52.     Accordingly, Sellers request reformation of the SPA to void Section 8 therein.

## COUNT III

### (Reformation – Equitable Fraud (In the Alternative))

53.     Sellers repeat and reallege the foregoing paragraphs and incorporate them as if fully set forth herein.

54.     During the parties' negotiation of the SPA, Ameris negligently misrepresented and/or omitted material facts concerning its intention to comply with the LTIP.

55.     During the parties' negotiation of the SPA, Ameris represented, by executing the LTIP and in conversations with Byrne regarding the same, that it would honor and comply with the LTIP's terms.

56.     These representations were false.  Ameris never intended to comply with the terms of the LTIP, and indeed, at its first opportunity to do so, intentionally miscalculated EBT in breach of the agreed-upon calculation methodology provided for in the LTIP.

57.     Sellers would not have entered into the SPA had they known these representations were false.

58.     Sellers would not have agreed to Section 8 of the SPA had they known these representations were false.

10

59.    Ameris made these misrepresentations with the intention of inducing Sellers' reliance.

60.    Sellers reasonably and justifiably relied on Ameris' misrepresentations.

61.    Sellers have suffered harm due to Ameris' negligent inducement of Sellers' entry into the SPA in reliance on Ameris' material misrepresentations and/or omission.

62.    Sellers lack an adequate remedy at law.

63.    Accordingly, Sellers request reformation of the SPA to void Section 8 therein.

## COUNT IV

### (Breach of Contract)

64.    Sellers repeat and reallege the foregoing paragraphs and incorporate them as if fully set forth herein.

65.    The SPA is a valid and enforceable contract, subject to its voidability at Sellers' option by reason of Ameris' fraud.

66.    Ameris breached Section 10.8  the SPA by initiating the Superior Court Action.

67.    Ameris' breach of Section 10.8 of the SPA caused Sellers to suffer damages, as they have been forced to defend against the Superior Court Action.

68.    Sellers will continue to incur damages in connection with defending against the Superior Court Action until they are able to secure a dismissal or transfer of the Superior Court Action.

69.    Accordingly, Sellers seek monetary damages in an amount to be determined at trial, equivalent to all costs and expenses incurred by Sellers in connection with the Superior Court Action.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request that this Court enter judgment against Defendant awarding Plaintiffs all appropriate relief, including the following:

a. Rescission or partial rescission of the SPA on the basis that Sellers' agreement to the same was fraudulently induced;

b. Awarding rescissory damages;

c. Alternatively, reformation of the SPA to void Section 8 therein;

d. Sellers' costs, attorneys' fees and expenses incurred in connection with this action; and

e. Such other and further relief as the Court may deem just and proper.


Dated: December 23, 2025

REED SMITH LLP

*/s/ Benjamin P. Chapple*
Benjamin P. Chapple (No. 5871)
John T. Miraglia (No. 6682)
1201 N. Market Street, Suite 1500
Wilmington, DE 19801
(302) 778-7500

*Counsel for Plaintiffs Patrick E. Byrne, The Patrick E. Byrne Revocable Trust U/T/A Dated February 23, 2001, and The Patrick E. Byrne Irrevocable Trust U/T/A Dated July 22, 2021*

12